**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **US MEDICAL NETWORKS LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **Civ. Action No. 3:19-cv-01848-E** |
| **vs.** | § | |
| | § | |
| **BIOFIRE DIAGNOSTICS LLC,** | § | |
| **XPRESSMED URGENT CARE OF** | § | |
| **CROWLEY, LLC, CHECK** | § | |
| **POINT URGENT CARE, LLC and** | § | |
| **RACHEL JONES,** | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANT BIOFIRE DIAGNOSTICS LLC'S ANSWER TO PLAINTIFF'S FIRST**
**AMENDED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

---

Defendant BIOFIRE DIAGNOSTICS, LLC ("BioFire") answers US MEDICAL
NETWORKS, LLC's ("USMN") First Amended Complaint and Request for Injunctive Relief
(the "Amended Complaint") as follows:

### RESPONSES TO PARTICULAR ALLEGATIONS

The Amended Complaint includes many allegations that are overly broad, vague,
ambiguous or conclusory, that include undefined terms susceptible of different meanings, or that
mix factual allegations with argumentative rhetoric, and therefore obstruct BioFire's ability to
make admissions or denials related to the allegations. This Answer is based on BioFire's
investigation to date, and BioFire reserves the right to amend this Answer further should new
information become available to BioFire during the course of this action. Except as expressly
admitted below, BioFire denies each and every allegation set forth in the Amended Complaint.

---

For ease of reference and in an attempt to clarify USMN's overly broad, vague, and ambiguous allegations, BioFire has included herein USMN's allegations (in italics) and then provide its answer to each allegation.  Also, in those cases where BioFire needs to refer to particular sentences in paragraphs of the Petition that contain more than one sentence, BioFire will number the sentences in the Amended Complaint

## PARTIES

1.     *Plaintiff US Medical Networks, LLC ("USMN") is a Delaware limited liability company duly authorized to conduct business in Texas.  Its principal office is 3575 Lone Star Circle, Suite 124, Fort Worth, Texas 76117.*

**ANSWER:** BioFire admits that USMN was organized as a Delaware limited liability company; but BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 1 and therefore denies them.

2.     *Defendant BioFire Diagnostics, LLC ("BioFire") is a Delaware limited liability company with its principal office at 515 Colorow Drive, Salt Lake City, Utah 84108.  BioFire has appeared in this lawsuit and may be served through its counsel of record.*

**ANSWER:** BioFire admits that it is a limited liability company organized and existing under the laws of Delaware and that it has a place of business at 515 Colorow Dr., Salt Lake City, Utah 84108.  BioFire admits that it has appeared in this lawsuit and may be served through its counsel of record.

3.     *Defendant XpressMed Urgent Care of Crowley, LLC ("XpressMed") is a Louisiana limited liability corporation that has engaged in business in Texas by entering into a contract with a Texas resident that required USMN's performance in Texas.  XpressMed has appeared in this lawsuit and may be served through its counsel of record.*

**ANSWER:** The allegations in this Paragraph relate to XpressMed. Therefore, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed to determine whether it is obligated to respond to the allegations and, if so, what its response should be.

4. *Defendant Check Point Urgent Care, LLC ("Check Point") is a Louisiana limited liability corporation that has engaged in business in Texas by entering into a contract with a Texas resident that required USMN's performance in Texas. Check Point has appeared in this lawsuit and may be served through its counsel of record.*

**ANSWER:** The allegations in this Paragraph relate to Check Point. Therefore, BioFire responds that it is not obligated to respond to such allegations and leaves it to Check Point to determine whether it is obligated to respond to the allegations and, if so, what its response should be.

5. *Defendant Rachel Jones is a natural person residing in Utah that can be served at 2327 E. Country Club Dr., Salt Lake City, Utah 84109-1601, or wherever she may be found.*

**ANSWER:** The allegations in this Paragraph relate to Rachel Jones. Therefore, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

## JURISDICTION AND VENUE

6. *This Court has subject matter jurisdiction over the lawsuit because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00. BioFire removed this matter to this Court on the basis of original diversity jurisdiction pursuant to 28 U.S.C. § 1332.*

**ANSWER:** BioFire admits that this Court has subject matter jurisdiction over the lawsuit because there is diversity of citizenship between USMN and the defendants and because the

amount of damages USMN has alleged exceeds the Court's minimum jurisdictional requirements.

7.      *(1) This Court has personal jurisdiction over BioFire, a nonresident, because BioFire engaged in minimum contacts with the State of Texas such that it could reasonably expect to be hauled into court in Texas in connection with its contacts.  (2) Among other things, BioFire engaged in business in Texas by contracting with USMN, a Texas resident.  (3) The parties entered into the First Amendment to Laboratory Services Provider Agreement (the "LSP Agreement") effective January 3, 2019, and it required performance in whole, or in part, in Texas.  (4) Among other things, the LSP Agreement required BioFire to lease instruments and sell kits to USMN, a Texas resident.  (5) The agreement also required USMN, a Texas resident, to make payments to BioFire from Texas.  (6) Additionally, BioFire traveled to Texas to negotiate the LSP Agreement.  (7) BioFire made misrepresentations to USMN while in Texas and also directed additional misrepresentations to USMN in Texas that harmed USMN.*

**ANSWER:** BioFire denies the allegations in the first sentence of Paragraph 7.  With respect to the allegations in the second and third sentences, BioFire admits that it entered into a First Amendment to Laboratory Services Provider Agreement ("First Amended LSP Agreement") with USMN effective January 3, 2019.  With respect to the allegations in the fourth and fifth sentences, BioFire admits that – pursuant to the First Amended LSP Agreement BioFire leased instruments and sold kits to USMN, a Texas resident, and USMN was required to pay for those instruments and kits.  With regard to the allegation in the sixth sentence, BioFire admits that some of the negotiations that led to the First Amended LSP Agreement were conducted in Texas.  BioFire denies the allegations in the seventh sentence of Paragraph 7 and any allegations in the other sentences of Paragraph 7 that BioFire has not expressly admitted above.

8.       *BioFire purposefully availed itself of the privileges and benefits of conducting business in Texas by traveling to Texas to negotiate with a Texas resident, entering into the LSP Agreement with a Texas resident, and making representations to a Texas resident.  This Court's exercise of personal jurisdiction over BioFire comports with traditional notions of fair play and substantial justice.*

**ANSWER:**  BioFire admits that it negotiated the First Amended LSP Agreement with USMN in part in Texas.  BioFire also admits that it entered into the First Amended LSP Agreement with USMN, a Texas resident.  BioFire denies the remaining allegations in Paragraph 8.

9.       *This Court has personal jurisdiction over XpressMed and Check Point because they engaged in minimum contacts with the State of Texas such that each could reasonably expect to be hauled into court in Texas in connection with their contacts.  Both engaged in business in Texas by contracting with USMN, a Texas resident.  Additionally, in the agreement between USMN, on the one hand, and XpressMed and Check Point, on the other, XpressMed and Check Point consented to jurisdiction in Texas.*

**ANSWER:**  The allegations in this Paragraph relate to XpressMed and Check Point.  Therefore, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

10.      *XpressMed and Check Point purposefully availed themselves of the privileges and benefits of conducting business in Texas by entering into the LSP Agreement with a Texas resident that required performance in Texas.  This Court's exercise of personal jurisdiction over XpressMed and Check Point comports with traditional notions of fair play and substantial justice.*

**ANSWER:** The allegations in this Paragraph relate to XpressMed and Check Point. Therefore, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

11.     *This Court has personal jurisdiction over Rachel Jones because she engaged in minimum contacts with the State of Texas such that she could reasonably expect to be hauled into court in Texas in connection with her contacts. Among other things, Ms. Jones directed agents to Texas for the purpose of improperly obtaining and misappropriating trade secrets from a Texas company in the State of Texas. Employees of BioFire, under Ms. Jones's direction and ability to control the means by which they accomplished their tasks, traveled to Texas and communicated into Texas with the purpose of obtaining trade secrets from a Texas company. Ms. Jones obtained those trade secrets for the purpose of directly competing with a Texas company, including in Texas. She made fraudulent representations or omissions or caused fraudulent representations or omissions to be made to a Texas company in connection with contracts that were performed, in part, in Texas.*

**ANSWER:** The allegations in this Paragraph relate to Rachel Jones. Therefore, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

## VENUE

12.     *(1) Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to USMN's claims occurred within this judicial district, or in the alternative, because a Defendant is subject to personal jurisdiction in this district. (2) Among other things, BioFire's representatives traveled to Dallas, Texas on or*

*about September 20, 2018 to meet with USMN at the Old Parkland Campus and negotiate terms of the LSP Agreement and the parties' relationship.  (3) Many of the false representations set forth herein were made at this meeting.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire and with respect to the first sentence of Paragraph 12, BioFire admits that it has appeared in this judicial district in this case.   In addition, with respect to the second sentence, BioFire admits that BioFire representatives met with USMN representatives in Dallas, Texas to discuss terms of the First Amended LSP Agreement on or about September 20, 2018.  BioFire denies the allegations in the third sentence and any allegations in the first and second sentences of Paragraph 12 that BioFire has not expressly admitted above.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

## FACTUAL BACKGROUND

**USMN and BioFire**

13.    *USMN is a medical management service company that develops, markets, and manages ancillary service product lines for healthcare providers.  Among other things, it offers proprietary billing support services, utilization management and stewardship services, information technology and electronic medical records ("EMR") integration services, training services, and laboratory supply and logistics management.  It provides those industry-leading ancillary services in connection with outpatient and point-of-care molecular testing for respiratory and gastrointestinal pathogens.  Point-of-care refers to those locations where patients receive care and includes urgent care facilities, free standing emergency rooms, or*

*physicians' offices.  Outpatient and point-of-care providers often have their own laboratories to assist with diagnosing the cause of patients' symptoms.*

**ANSWER:**  BioFire admits that point-of-care may be defined as locations where patients receive care including urgent care facilities, free standing emergency rooms, or physicians' offices. BioFire admits that some outpatient and point-of-care providers may have their own laboratories to assist with diagnosing the cause of patients' symptoms.  BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 13 and therefore denies them

14.     *BioFire is a manufacturer and seller of symptom-driven clinical diagnostics solutions to healthcare providers.  BioFire's symptom-driven diagnostics combine a broad grouping of probable pathogenic causes into a single test.  Among other things, BioFire manufactures and sells testing instruments, including the BioFire® Torch and BioFire® RP EZ Instrument (collectively "the Instruments").* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ *BioFire also manufactures "Kits" which are bundles of a specific diagnostic test. Upon information and belief, prior to the wrongful conduct alleged herein, BioFire has never provided the ancillary services USMN provides to its customers.*

**ANSWER:** BioFire admits that it manufactures and sells syndromic clinical diagnostics products that test for multiple pathogens in a single test and provides related solutions to healthcare providers.  BioFire's products include testing instruments such as the BioFire® Torch and BioFire® RP EZ Instruments (collectively, the "Instruments"). ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ BioFire also admits that it manufactures and sells bundles of specific diagnostic test panels called "Kits."  BioFire denies that it has committed any of the wrongful conduct USMN alleges.  BioFire further denies the allegation that BioFire had never

provided any services like the ancillary services that USMN provides before BioFire first met USMN.  BioFire has previously provided, including prior to entering into any agreement with USMN, and still provides certain functionalities or solutions to its customers associated with the BioFire® FilmArray® System, including, but not limited to, Reimbursement and Market Access, BioFire® FilmArray® Link, and an Antimicrobial Stewardship Program.  BioFire denies any remaining allegations in Paragraph 14.

**The LSP Agreement and the Purchase Order Process**

15. *(1) USMN and BioFire began discussions about partnering in 2018.  (2)USMN reached out to BioFire to explain how its proprietary services offerings would complement BioFire's Products.  (3) BioFire saw the value in the services offerings and was interested in a relationship that would allow USMN to market, sell, and provide healthcare providers with the BioFire Instruments and Kits (collectively the "Products").  (4) USMN would sell, market, and provide only BioFire Products and forego selling competitive products.  (5) During negotiations, BioFire represented to USMN that it had no interest in developing and providing its own services solutions and competing with USMN's ancillary services offerings, and that it would not do so.*

**ANSWER:** With respect to the allegation(s) in the first sentence of Paragraph 15, BioFire denies that it and USMN ever discussed or entered into a partnership.  With respect to the allegation(s) in the second and third sentences, BioFire asserts that while USMN started placing BioFire Instruments at first without BioFire's knowledge or permission, after BioFire contacted USMN, USMN expressed an interest in selling BioFire Instruments and Kits along with ancillary services USMN would provide and BioFire, in turn, was interested in entering into a contractual business relationship to allow USMN to do that while BioFire continued to sell its Instruments

and Kits.  BioFire further answers that USMN stated that its service offerings were valuable, and BioFire accepted USMN's statements to that effect; but over time, BioFire discovered that a significant number of USMN's potential customers were not willing to pay USMN for its services.  With regard to the allegation(s) in the fourth sentence, BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of USMN's allegations and therefore denies them.  BioFire denies the allegations in the fifth sentence and any allegations in the first four sentences of Paragraph 15 that BioFire has not expressly admitted above.

16.   *(1) On or about May 15, 2018, USMN and BioFire entered into an agreement. (2) During the parties' relationship, BioFire asked USMN to share its marketing strategies and demonstrate the capabilities and functionality of its software service offerings, including the processes and source code behind its utilization management and stewardship services.* ███████

████████████████████████████████████████████████████

█████████████ *Instrument and a portal USMN developed.  (4) USMN shared source code relating to this* ██████████ *with BioFire.   (5) USMN spent considerable time and incurred significant expense developing the processes for its services and coding the software used in providing those services. (6) USMN considers this information highly confidential and trade secret. (7) It does not disclose this information outside of confidential relationships and takes reasonable precautions to maintain its confidentiality. (8) USMN shared the highly confidential and trade secret information in confidential communications with BioFire in the course of the parties' contractual relationship.*

**ANSWER:** With respect to the allegation(s) in the first sentence of Paragraph 16, BioFire denies entering into an agreement with USMN on or about May 15, 2018; rather BioFire entered into a Laboratory Services Provider Agreement with US Medical Clinics, LLC ("USMC"), on or

about May 15, 2018.  It was not until January 3, 2019, that BioFire entered into an agreement with USMN.  With respect to the allegation(s) in the second, third, and fourth sentences, BioFire admits that during the parties' relationship, BioFire employees and USMN employees discussed in general terms BioFire's and USMN's sales plans.  BioFire further admits that BioFire and USMN employees also discussed BioFire's product solutions and features and USMN's services and the software USMN used to provide some of its services, including the technical difficulties USMN was having obtaining – from the database on laptop computers connected to BioFire Instruments – the data that USMN needed to provide it services; BioFire denies, however, asking for the processes and source code behind USMN's utilization management and stewardship services, and BioFire denies that any information shared with BioFire was highly confidential or trade secret.  BioFire also denies that it received any source code for software related to USMN's ancillary services or portal.  With respect to the sixth and seventh sentences, BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in these sentences and therefore denies them.  BioFire denies any remaining allegations in Paragraph 16.

17.     *USMN also invested extensive time and effort to successfully market and sell BioFire's Products.  It learned about the Products, trained its sales personnel on the Products, and developed and/or modified software compatible with those Products to be used in providing its own services.*

**ANSWER:** BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the allegations of Paragraph 17 and therefore denies them.

18.     *(1) USMN was successful in placing BioFire's Products with many different healthcare providers.  (2) USMN's initial contracts with healthcare providers consistently*

*transitioned into longer-term and larger-scope agreements.  (3) Those healthcare providers were apparently very satisfied with the Products and services they received, and most renewed their contracts with USMN and continued to utilize BioFire's Instruments and purchase Kits to perform diagnostic tests.  (4) A significant amount of those health care providers increased their orders with USMN, either by ordering additional Instruments for the original site or sites or expanding to new sites.  (5) USMN also continued to provide its ancillary services to those Qualified Sites. (6)  Those services included proprietary billing support, utilization management and stewardship, and information technology and EMR integration.  (7) Every USMN customer received at least utilization management and stewardship services from USMN in connection with BioFire's Products.*

**ANSWER:** With respect to the first sentence of Paragraph 18, BioFire admits that USMN placed BioFire Products with more than 75 healthcare providers although a number of these placements were short term and the Instruments were removed.  With respect to the second sentence, BioFire denies that USMN's initial contracts with healthcare providers consistently transitioned into longer-term and larger-scope agreements.  With regard to the third, fourth, fifth and sixth sentences, BioFire denies USMN's allegations as to USMN services, such as billing support, utilization management and stewardship, and information technology and EMR integration services.  With respect to the seventh sentence, BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of such allegations and therefore denies them.  BioFire denies the remaining allegations in Paragraph 18.

19.     *In or around the fall of 2018, USMN and BioFire decided to amend and replace their original contract with a new contract.  USMN and BioFire engaged in many discussions about the terms of the new contract and the parties' relationship, including the marketing of*

*BioFire Products.  During negotiations, BioFire told USMN that it was interested in making*

*USMN the sole service provider of its symptom-driven clinical diagnostics.*

**ANSWER:** BioFire admits that in the fall of 2018, USMN and BioFire decided to replace the agreement between USMC and BioFire and engaged in discussions about the terms of the new agreement.  BioFire denies that – during those negotiations – BioFire told USMN that BioFire was interested in making USMN the sole provider of BioFire symptom-driven clinical diagnostics; rather, BioFire told USMN that if USMN met certain goals for sales of BioFire products within certain time periods then BioFire was interested in designating USMN as BioFire's exclusive provider of "Services," as that term was defined in the First Amended LSP Agreement that BioFire and USMN entered into, in the point-of-care market only.  BioFire denies any remaining allegations in Paragraph 19.

20.     *(1) On or about September 20, 2018, BioFire representatives traveled to Dallas, Texas for a meeting with USMN at the Old Parkland Campus.  (2) They continued their negotiations regarding the proposed amended agreement.  (3) At this meeting, and on later phone calls, USMN explained the effort and expense it was investing in marketing BioFire's Products.  (4) Additionally, because BioFire also continued to sell its own Products, USMN expressed concern that BioFire would engage in activities detrimental to USMN's efforts—in essence, that BioFire would compete for the same health care providers and cut USMN out of the process.  (5) BioFire's representatives repeatedly assured USMN that it would not interfere with and would support USMN's efforts.  (6) They also stated that they had no interest in providing, and would not provide, the same types of ancillary services USMN offered the health care providers.*

**ANSWER:**  With respect to the first two sentences of Paragraph 20, BioFire admits that BioFire representatives traveled to Dallas, Texas on or around September 20, 2018 for a meeting with USMN at the Old Parkland Campus and had discussions regarding a potential replacement of the agreement between USMC and BioFire.  BioFire denies the remaining allegations in Paragraph 20.

21.     *Ultimately, USMN and BioFire entered into the LSP Agreement, which became effective January 3, 2019.*

**ANSWER:**  BioFire admits that USMN and BioFire entered into the First Amended LSP Agreement and that the agreement became effective January 3, 2019.

22.     *Under the LSP Agreement, USMN would lease the BioFire Instruments from BioFire.  It would, in turn, provide the Instruments to those outpatient or point-of-care providers with whom it had entered into a Laboratory Services Agreement (the agreement refers to those providers as "Qualified Sites").  A draft of the Laboratory Services Agreement was incorporated into the LSP Agreement as Exhibit 1.*

**ANSWER:**  BioFire admits that under the First Amended LSP Agreement, BioFire would lease BioFire Instruments to USMN for USMN to provide to Qualified Sites only as part of USMN's Services offering (as the terms "Qualified Sites" and "Services" are defined in the First Amended LSP Agreement) pursuant to Laboratory Services Agreements between USMN and its customers that were approved by BioFire.  A template of the Laboratory Services Agreement USMN was to enter into with its customers was attached to the First Amended LSP Agreement between BioFire and USMN as Exhibit 1.  BioFire denies any remaining allegations in Paragraph 22.

23.     *Once USMN had successfully marketed its services and entered into a Laboratory Services Agreement with a Qualified Site, USMN was required to send a Purchase Order and a*

*copy of the Laboratory Services Agreement to BioFire.   The Laboratory Services Agreement*

*USMN sent to BioFire included the pricing and other order terms upon which USMN and the*

*Qualified Site had agreed.*

**ANSWER:**  BioFire admits that once USMN had entered into a Laboratory Services Agreement

with a Qualified Site, USMN was required – by the First Amended LSP Agreement between

BioFire and USMN – to send a Purchase Order and a copy of USMN's Laboratory Services

Agreement with the customer to BioFire, but BioFire further answers that USMN did not always

send a copy of its Laboratory Services Agreement with its customer to BioFire and USMN did

not always send a copy of the approved version of the Laboratory Services Agreement with its

customer to BioFire.  BioFire denies any remaining allegations in Paragraph 23.

24.     *If BioFire accepted the Purchase Order, BioFire would deliver and install the*

*Instruments that had been ordered.  BioFire would, among other things, ship the Instruments to*

*the Qualified Site and then send one of its "Field Application Specialists" to install the*

*Instruments, ensure that they were working, and train the Qualified Site's personnel.*

**ANSWER:** BioFire admits that it generally would deliver and install Instruments after

accepting a Purchase Order for the Instruments.  BioFire further admits it generally would ship

the Instruments to the Qualified Site and then send one of its "Field Application Specialists" to

install the Instruments, ensure the Instruments were in proper working order, and train the

Qualified Site's personnel in the proper use of the Instruments and Kits.  BioFire denies any

remaining allegations in Paragraph 24.

25.     *In exchange for the right to lease and provide the BioFire Instruments and sell the*

*Kits, USMN agreed to a "Kit Commitment." The Kit Commitment obligated USMN to purchase a specific volume of Kits based on the number of Instruments that it had leased to Qualified Sites. The Kit Commitment included both an annual and aggregate commitment.*

**ANSWER:**:  BioFire admits that in the First Amended LSP Agreement, the parties agreed that, "[a]s sole consideration for the lease of each Instrument, [USMN] shall agree to a kit commitment as set forth in Exhibit 2 – Products & Pricing ('Kit Commitment').  LSP's Kit Commitment for each Instrument will be for three years and will require both an annual and aggregate commitment."  BioFire denies any remaining allegations in Paragraph 25.

26.    *The LSP Agreement included a valuable incentive for USMN to successfully market BioFire's Products.  It set forth certain criteria that, if met, would allow USMN to become BioFire's exclusive provider of specified "Core Services."*

**ANSWER:** With respect to the allegation in the first sentence of paragraph 29, BioFire is without information and belief sufficient to form a belief about the truth or falsity of USMN's allegation of the value of the alleged incentive and therefore denies the same – because BioFire does not know how realistic USMN considered the sales goals it had to meet in order to be designated BioFire's exclusive provider of Services (as defined in the First Amended LSP Agreement).  With respect to the second sentence, the sentence does not accurately reflect the First Amended LSP Agreement, and therefore BioFire denies the allegation.  BioFire denies any remaining allegations of Paragraph 26.

27.    *(1) Because USMN would continue investing considerable time, effort, and expense in marketing its services and placing BioFire Products with Qualified Sites, and because USMN would continue to share its confidential and trade secret information with BioFire, it was critical to USMN that certain boundaries exist with respect to BioFire's own sales efforts.  (2)*

*BioFire made repeated representations to USMN that it would not market or sell its products to Qualified Sites (those healthcare providers who had entered into Laboratory Services Agreements with USMN).  (3) BioFire made those representations both before and after the parties entered into the LSP Agreement.*

**ANSWER:** With respect to the allegations in the first sentence of Paragraph 27, BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the allegations and therefore denies them.  BioFire admits that it agreed "not to market or sell Products, directly or indirectly, to any Qualified Sites" during the term of the First Amended LSP.  BioFire denies any remaining allegations in Paragraph 27.

28.     Moreover, the LSP Agreement included the following:

> **Non-Circumvention**.  As additional consideration for, and in recognition of, [USMN's] and its Subproviders' efforts hereunder, BioFire agrees not to market or sell Products, directly or indirectly, to any Qualified Sites during the Term of this Agreement (including any Exclusivity Period). All requests for purchase of Products from any Qualified Sites will be forwarded immediately to [USMN] for processing.

**ANSWER:** Admitted.

29.     *BioFire also represented that it had no interest in developing ancillary services solutions and offering the same types of services to healthcare providers as USMN.*

**ANSWER:** Denied.

30.     *The initial term of the LSP Agreement was for a period of three years.  It would renew automatically for a twelve-month renewal period unless terminated in accordance with the terms of the agreement.*

**ANSWER:** BioFire admits that the First Amended LSP Agreement covered a period of three years, and if the agreement was not terminated prior to the end of that period, the term of the agreement would be extended for an additional period, subject to additional conditions stated in

the First Amended LSP Agreement, including BioFire's election of non-renewal. BioFire denies any remaining allegations in Paragraph 30 to the extent they are inconsistent with the terms of the First Amended LSP Agreement.

31. *BioFire and USMN agreed that the LSP Agreement would be supplemented with* ████████████████████████████████████████████ *was available.*

**ANSWER:** Denied.

**USMN's Contracts and Relationships**

32. *(1) USMN worked diligently to market its services to, and place BioFire's Products with, outpatient and point-of-care providers. (2) Throughout the parties' relationship, USMN entered into Laboratory Services Agreements with over seventy-five Qualified Sites.*

**ANSWER:** BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the first sentence of Paragraph 32 and therefore denies them. With respect to the second sentence, BioFire admits that it shipped Products for at least 75 healthcare provider locations for USMN although a number of USMN's placements of Instruments were short term and the Instruments were subsequently removed. BioFire denies any remaining allegations in Paragraph 32.

33. *On or about March 28, 2019, USMN and XpressMed and Check Point reached an agreement by which XpressMed and Check Point would purchase BioFire Products and USMN's services. The parties agreed upon all material terms, including the price to be charged to XpressMed and Check Point. XpressMed and Check Point executed a Laboratory Services Agreement with USMN. The agreement, like all USMN Laboratory Services Agreements, included a confidentiality provision. It also included a provision that authorized USMN to supply missing information or correct obvious errors in the agreement.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied. To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

34.     *(1) After USMN received the signed Laboratory Services Agreement from XpressMed and Check Point, USMN's sales personnel realized he had sent a version of the contract containing the incorrect payment term.  (2) The price would be the same, but the timing of payments would be different.  (3) In order to correct the obvious error, USMN promptly sent the agreement containing the agreed-upon payment term to XpressMed and Check Point.  (4) XpressMed and Check Point did not dispute the existence of a contract.  (5) Rather, an XpressMed office manager authorized to work with vendors had conversations with USMN about scheduling the delivery of the Instruments and the installation requirements.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied. To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

**BioFire's [Alleged] Interference with USMN's Contracts and Relationships and Other Wrongful Conduct**

35.     *(1) USMN was required to send its Purchase Order and the Laboratory Services Agreement between it and XpressMed and Check Point to BioFire for BioFire to fill the order.  (2) Indeed, the LSP Agreement includes the following provision: "No Purchase Order will be*

*accepted without [USMN] providing a copy of the agreement between it and the Qualified Site."*
*(3) USMN sent BioFire the agreement XpressMed and Check Point had signed.*

**ANSWER:**  With regard to the first and second sentences of Paragraph 35, BioFire admits that USMN was required to send its Purchase Orders and Laboratory Services Agreements with customers to BioFire for BioFire to fill the orders.  BioFire further admits that the First Amended LSP Agreement includes the following provision:  "No Purchase Order will be accepted without LSP providing a copy of the agreement between it and the Qualified Site."  With regard to the third sentence of Paragraph 35, BioFire admits that, only after BioFire requested that USMN provide signed agreements with XpressMed and Check Point, USMN sent BioFire a document that USMN claimed was a Laboratory Services Agreement with XpressMed and Check Point that XpressMed and Check Point had signed.  USMN did not, however, inform BioFire that it had withdrawn those agreements, requested new agreements with XpressMed and Check Point, or that neither XpressMed nor Check Point agreed to sign the new agreements.  BioFire denies any remaining allegations in Paragraph 35.

36.    *The Laboratory Services Agreement with XpressMed and Check Point that USMN sent to BioFire included USMN's confidential and trade secret pricing and order terms.*

**ANSWER:**  BioFire admits that USMN sent to BioFire a document that USMN claimed was a Laboratory Services Agreement with XpressMed and Check Point.  BioFire denies the remaining allegations in Paragraph 36.

37.    *According to the LSP Agreement, BioFire's acceptance of a Purchase Order is established by the first to occur of either (i) a written acknowledgment of acceptance; or (ii) BioFire delivering Products to a Qualified Site.  BioFire shipped the ordered Instruments to XpressMed and Check Point and thus accepted USMN's Purchase Order.*

**ANSWER:** BioFire admits that the First Amended LSP Agreement provides that "BioFire reserves the right to reject any Purchase Order for any reason, including but not limited to LSP's payment history… BioFire's acceptance is established by (a) BioFire delivering written acknowledgement of acceptance to LSP, or (b) BioFire delivering Products to a Qualified Site, whichever occurs first." BioFire admits it shipped Instruments to XpressMed and Check Point. BioFire denies the remaining allegations in Paragraph 38.

38.      *(1) After BioFire received the Laboratory Services Agreement between USMN and XpressMed and Check Point, BioFire significantly undercut USMN's pricing and persuaded XpressMed and Check Point to enter into contracts with BioFire for the very same Products— and on a much larger scale.  (2) Rather than forwarding inquiries from XpressMed and Check Point to USMN, as BioFire is required to do under the LSP Agreement, BioFire employees directed XpressMed and Check Point to claim that they had not actually entered into an agreement with USMN.  (3) BioFire even drafted the email it wanted XpressMed and Check Point to send to USMN denying the existence of an agreement.  (4) XpressMed and Check Point sent that very email to USMN and then, as proof of compliance with BioFire's instructions, forwarded it on to BioFire.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, with regard to the first and second sentences of Paragraph 38, denied.  With regard to the allegations in the third sentence of Paragraph 38, BioFire admits that XpressMed and Check Point explained to BioFire that they did not have an agreement with USMN.  BioFire further admits that its sales personnel provided to XpressMed and Check Point that BioFire would need confirmation that XpressMed and Check Point did not have an agreement with USMN before BioFire could make an agreement with XpressMed and Check Point.  BioFire further admits that its sales personnel

provided a draft email to request such confirmation.  Biofire also admits that XpressMed and Check Point sent such an email to USMN to confirm acknowledgement that they did not have an agreement with USMN and forwarded such communication to BioFire.  BioFire denies the remaining allegations in Paragraph 38.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

39. *(1) BioFire was successful in stealing XpressMed's and Check Point's business. (2) Because of BioFire's actions, those entities failed to honor their contract with USMN and entered into a new and expanded agreement directly with BioFire.  (3) USMN lost not only the initial contract with those entities, but the prospective business relations it had a reasonable expectation of developing.   (4) Indeed, BioFire entered into a long-term contract with XpressMed and Check Point.  (5) Upon information and belief, BioFire is using or preparing to use the confidential and trade secret information regarding USMN's ancillary services, particularly its utilization management and stewardship services, to provide similar services to XpressMed and Check Point, as well as other customers.  (6) BioFire had discussions with XpressMed and Check Point about EMR integration and the* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ *USMN developed and shared with BioFire.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, BioFire admits that it entered into an agreement with XpressMed and Check Point.  As to the allegations in the sixth sentence of paragraph 39, BioFire admits that it discussed its Products' systems with XpressMed and Check Point.  BioFire denies the remaining allegations in Paragraph 39.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire

responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

40.    *USMN learned about BioFire's wrongful actions and confronted BioFire's representatives about stealing the XpressMed and Check Point contracts and relationships from them.  BioFire initially admitted its actions were wrong and indicated it was "open to reaching an amicable resolution."  BioFire admitted to USMN that its actions were wrongful even though only XpressMed's and Check Point's representative had executed the version of the agreement sent to BioFire.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, BioFire admits that when USMN accused BioFire of stealing the XpressMed and Check Point contracts and relationships BioFire attempted to reach an amicable resolution of USMN's claim with USMN – despite the fact that USMN never had an agreement with XpressMed and/or Check Point. BioFire denies the remaining allegations in Paragraph 40.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

41.    *USMN and BioFire had many discussions about the ways BioFire could right its highly damaging and wrongful conduct.  The parties discussed, among other things, entering into an amended agreement and setting out "Rules of Engagement" that would apply to USMN's and BioFire's marketing efforts.  In at least one conversation, in admission of its own wrongful conduct with XpressMed and Check Point, BioFire's representatives, Curt Caldwell, the Director of Point- of-Care and Jim Kathrein, the Vice President of Sales, instructed USMN to*

*forego making payments they owed BioFire and represented that the amounts of those payments could be treated as an offset to any amounts BioFire owed USMN due to its interference with the XpressMed and Check Point contract. They said those payments "would come out in the wash."*

**ANSWER:** BioFire admits that BioFire and USMN discussed USMN's claim that BioFire had acted improperly with regard to XpressMed and Check Point and discussed various ways that USMN could pay its steadily increasing accounts payable balance, but BioFire denies ever stating that USMN could forego making payments, that BioFire would offset any amounts owed, or that BioFire would otherwise waive its accounts receivable. BioFire further admits that the parties discussed entering into an amended agreement and also discussed creating a "Rules of Engagement" policy that included proposed new procedures not included in the First Amended LSP Agreement intended to help avoid having BioFire and USMN sales efforts cross in an inefficient manner. BioFire denies the remaining allegations in Paragraph 41.

42.      *(1) Unbeknownst to USMN, Rachel Jones, a Senior Vice President and Chief Commercial Officer at BioFire, had already made the decision to terminate the contract with USMN but, at the same time, lead USMN to believe the relationship would continue. (2) Upon information and belief, the reason for Ms. Jones's deception was to get USMN to disclose to BioFire its "hot leads"—prospects that it was working with, but that had not yet signed contracts— as well as any new "Qualified Sites" it continued to develop. (3) Ms. Jones, through her conduct and discussions with USMN, caused USMN to believe that there was a reasonable likelihood of the parties' relationship continuing. (4) Among other things, she discussed the "Rules of Engagement" and a proposed amendment to the parties' agreement. (5) Additionally, Mr. Caldwell, Mr. Kathrein, and Mr. Thomas Reen, all of whom report to and take direction from Ms. Jones, represented to USMN that BioFire was open to resolving the XpressMed and*

*Check Point issue and carrying on the relationship under new rules. (6) They assured USMN that it needed to provide information about its prospects and Qualified Sites in order for the relationship to continue in a productive manner and to finalize the "Rules of Engagement." (7) Ms. Jones either disclosed to Messrs. Caldwell, Kathrein, and Reen her decision to terminate USMN and charged them with continuing negotiations despite their knowledge, or, alternatively, she failed to disclose to them her ultimate plan and charged them with continuing negotiations. (8) Simply put, depending on what Ms. Jones disclosed to them about her true intentions, Messrs. Caldwell, Kathrein, and Reen were either active participants in the deception or were innocently following orders Ms. Jones delivered and were props Ms. Jones used to deliver misleading information to USMN.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, BioFire denies sentences one, two, six, seven and eight of Paragraph 42. BioFire is without sufficient information and belief relating to the allegations contained in the third sentence of Paragraph 42, and therefore denies the same. With respect to the fourth and fifth sentences of Paragraph 42, BioFire admits that it attempted to reach an amicable resolution with USMN and discussed a proposed amendment to the parties' agreement with USMN. Answering further, BioFire admits that both USMN and BioFire discussed creating a "Rules of Engagement" policy that included proposed new procedures not included in the First Amended LSP Agreement intended to help avoid having BioFire and USMN sales efforts cross in an inefficient manner. BioFire denies any remaining allegations of Paragraph 42. To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

43.     *(1) USMN justifiably relied on the representations and conduct that Ms. Jones personally directed to USMN in Texas, and that she knew and ordered Messrs. Caldwell, Kathrein, and Reen to direct to USMN in Texas, in sharing its list of "hot leads" and other prospects with BioFire.  (2) It also continued to share trade secret information about Qualified Sites.  (3) While USMN waited on BioFire to finalize the proposed resolution, USMN continued pursuing opportunities to place BioFire Products with outpatient and point-of-care providers. (4) USMN entered into a sizeable contract—its highest volume contract to date—with Hansa Medical Groupe, LLC ("Hansa") a provider based in Illinois.  (5) It also sent BioFire Purchase Orders for several other Qualified Sites.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, with respect to the allegations in the first and second sentences of Paragraph 43, denied.  With respect to the allegations in the third sentence of Paragraph 43, BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the allegations, and therefore denies the same.  With respect to the allegations in the fourth and fifth sentences of Paragraph 43, BioFire admits that USMN sent to BioFire Purchase Orders for a small number of provider locations in the Hansa Medical Groupe.  BioFire denies any remaining allegations in Paragraph 43.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

44.     *Mr. Caldwell, BioFire's Director of Point-of-Care, sent at least one of USMN's prospect lists to BioFire's sales team, promising them information that the sales team "will be very happy about."  Upon information and belief, BioFire and Rachel Jones intended to appropriate that list of leads for BioFire's own direct sales, to USMN's detriment.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, BioFire admits that Mr. Caldwell provided a list of locations sent by Jarrod Pettit to BioFire employees and requested that employees seek clearance from him before contacting any entity on the list.  He noted separately, "We will be sending out some more information this week that you will be very happy about" because ██████████████████████████████████████████ ███████████████████████████████ BioFire denies the remaining allegations in Paragraph 44.   To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

45.     *Additionally, USMN reasonably relied on Mr. Caldwell's and Mr. Kathrein's representations, made on behalf of BioFire, that it need not make payments on outstanding invoices until the parties resolved their dispute about XpressMed and Check Point, at which point the payment amounts would be offset against any agreed-upon monetary solution.*

**ANSWER:** Denied.

46.     *Based on these representations, USMN temporarily ceased making payments to BioFire.*

**ANSWER:** BioFire admits USMN stopped making payments it owed to BioFire beginning in at least January 2019 and thereafter.  BioFire denies the remaining allegations in Paragraph 46.

47.     *(1) Ultimately, BioFire's proposed resolutions for its wrongful conduct, including interference with the XpressMed and Check Point contract and relationship, were unacceptable to USMN—which is precisely what BioFire intended.  (2) BioFire, and Ms. Jones in particular, intended to offer a resolution so unpalatable to USMN that it would send USMN into a "tailspin" and give BioFire the out Ms. Jones had already decided upon.  (3) BioFire proposed*

*a Second Amendment to the LSP Agreement that granted BioFire the vast majority of the proceeds from the relationships with XpressMed and Check Point, and provided USMN with only a credit of five percent of the revenue generated for the orders BioFire was filling for XpressMed and Check Point under the original Laboratory Services Agreement between USMN and XpressMed and Check Point.  (4) BioFire refused to provide USMN any compensation for the increased scope of XpressMed and Check Point's order with BioFire, even though the LSP Agreement prohibited BioFire from selling or marketing to Qualified Sites at all and required BioFire to refer all order requests from Qualified Sites to USMN.  (5) The proposed Second Amendment also included a release of USMN's claims against BioFire.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, with respect to the allegations in the first sentence of Paragraph 47, BioFire admits that it proposed to USMN that the parties enter into a Second Amendment to Laboratory Services Provider Agreement; BioFire denies, however, that it engaged in any wrongful conduct.  BioFire denies the allegations contained in the second sentence.   With regard to the allegations in the third and fourth sentences, BioFire admits that the proposed Second Amendment to Laboratory Services Provider Agreement included provisions providing "BioFire will provide LSP a credit equal to five percent (5%) of BioFire's reagent contract revenue from reagents only…included in LSP's original written sales proposal or quote to XpressMD according to the following terms: (a) reagent contract revenue will only be paid for the original term of BioFire's contract with XpressMD, and no amount will be owed to LSP for any reagent sales made beyond the original contract term, or for reagents added to the BioFire contract by amendment; (b) BioFire reagent sales made to XpressMD will not be applied toward USMN's kit volume discounts or aggregate reagent purchase volume; and (c) XpressMD will be credited to LSP's aggregate site credit for

purposes of calculating LSP's exclusivity eligibility."  With regard to the allegation in the fifth sentence, BioFire admits that the proposed Second Amendment also included a release of USMN's claims against BioFire, if any.  BioFire denies the remaining allegations in Paragraph 47.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

48.     *Interestingly, the transmittal correspondence accompanying the proposed Second Amendment accused USMN of failing to pay several outstanding invoices—the very invoices Messrs. Caldwell and Kathrein had told USMN not to pay.  BioFire had not previously raised the issue of unpaid invoices or provided USMN with any notice of default.  Additionally, BioFire claimed USMN was behind on the pouch purchases counting toward its Kit Commitment, although the Kit Commitment was to be determined on an annual and aggregate basis.*

**ANSWER:** BioFire admits that its transmittal email, dated June 14, 2019, for the Second Amendment to Laboratory Services Agreement, included the statements that "US Medical Networks has a significant accounts receivable balance, including several invoices that are past due 91-120 days…US Medical Network's prorated year to date pouch purchases are significantly behind the committed volumes and does not suggest you will comply with our current agreement."  However, BioFire had sent previous notices to USMN notifying USMN of its past due invoices.  BioFire denies the remaining allegations in Paragraph 48.

49.    *As BioFire and Rachel Jones intended and orchestrated, USMN rejected BioFire's proposal as it did not approach addressing the current and future damage BioFire's conduct caused.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, BioFire denies any allegations relating to BioFire's and/or Rachel Jones' purported intent alluded to in Paragraph 49.  BioFire admits that USMN did not accept its proposal for a Second Amendment to the parties' agreement.  BioFire denies the remaining allegations in Paragraph 49.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

50.    *(1) BioFire and Rachel Jones then fully implemented Ms. Jones' pre-conceived termination plan.  (2) In correspondence dated June 22, 2019, BioFire again faulted USMN for withholding payments and declared USMN in "non-compliance with the contracted [K]it [C]ommitment"—despite the Kit Commitment being on an annual and aggregate basis and BioFire's knowledge that kit purchases are seasonal, with the majority made months later in the fall and winter.  (3) USMN did not even have an obligation to provide BioFire with information regarding the pace of Kit purchases, much less to maintain a particular pace throughout the year.  (4) BioFire had no contractual basis to terminate USMN based upon the pace of its Kit purchases.  (5) BioFire stated that it had placed USMN's account on hold and would not accept new Purchase Orders or ship products to Qualified Sites.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, with respect to the allegation in the first sentence of Paragraph 50, denied.  With respect to the allegations in the second and fifth sentences, BioFire admits that in correspondence dated June 22, 2019, BioFire

stated to USMN:  "Thank you for your June 21st e-mail responding to one of the concerns BioFire raised in our June 14th communication, namely the significant number of BioFire invoices USMN has failed to pay.  As you acknowledge in your response, USMN has many undisputed invoices that have been outstanding for more than sixty days.  In fact, 42% of USMN's unpaid invoices...are past due 61 days or more…BioFire has placed USMN's account on hold and we will not accept new purchase orders or ship products to Qualified Sites.  In light of where we stand with respect to USMN's apparent inability to comply with the agreement's payment terms as well as its non-compliance with the contracted kit commitment, BioFire does not believe our relationship with USMN is sustainable going forward."  With respect to the fourth sentence, BioFire denies that it relied on USMN's failure to meet its kit commitment as a contractual basis for termination.  BioFire denies the remaining allegations in Paragraph 50.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

51.     *(1) BioFire failed to fill the Purchase Order for Hansa and ceased doing business with USMN entirely.  (2) BioFire apparently claims it had the right to put USMN's account on hold because USMN failed to make certain payments—the very payments BioFire told it not to make and that it would treat as an offset—and because USMN had not met a Kit Commitment it was not required to meet until January 3, 2020.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, with respect to the allegations in the first sentence of Paragraph 51, BioFire admits it did not fill any Purchase Orders for USMN after June 22, 2019, when it placed USMN's account on hold.  With respect to the allegations in the second sentence, the First Amended LSP Agreement provides that "In the

event [USMN] fails to pay any undisputed amount within sixty (60) days from the invoice date,

BioFire may provide written notice of default to [USMN] and place [USMN]'s account with

BioFire on credit hold.  If [USMN] fails to cure such default within ten (10) days' of receiving

such notice, BioFire reserves the right to require other payment terms, including without

limitation, payment in advance and/or letters of credit.  [USMN] is not entitled to abate or reduce

payments, or to offset any amounts or charges against the amounts due to BioFire under this

Agreement."  BioFire denies the remaining allegations in Paragraph 51.  To the extent that the

allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not

obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is

obligated to respond to the allegations and, if so, what her response should be.

52.     *It is clear BioFire never intended to allow USMN to offset the unpaid amounts*

*against any agreed-upon monetary solution for its interference with XpressMed and Check*

*Point.  Rather, BioFire was orchestrating a "default" they could use against USMN.  Because of*

*BioFire's fraudulent representations and its subsequent actions in placing USMN's account on*

*hold, USMN lost not only its largest contract to date, but all contracts for BioFire Products, and*

*it has suffered significant harm, including reputational harm.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the

extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that

it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine

whether she is obligated to respond to the allegations and, if so, what her response should be.

53.     *(1) BioFire is in possession of several of USMN's Laboratory Services*

*Agreements containing USMN's confidential and trade secret pricing and order information,*

*marketing strategies, and the functionality and processes, including source code, of its*

*proprietary software systems.   (2) BioFire has already used USMN's confidential and trade secret information to interfere with USMN's contracts and relationships with XpressMed and Check Point, including by undercutting USMN's pricing.   (3) BioFire emails show that BioFire was looking to replicate USMN's marketing strategies.   (4) And Mr. Caldwell has already sent BioFire's sales team a list of prospects USMN had sent it in connection with the "Rules of Engagement" discussions.   (5) Incredibly, upon information and belief, Ms. Jones and Mr. Caldwell used USMN's trade secret information in soliciting business from Hansa.   (6) Importantly, USMN only submitted the contracts and other trade secret information about Hansa in connection with negotiations about an ongoing relationship— after Ms. Jones had already decided to terminate the relationship.   (7) There is also an imminent threat BioFire will use USMN's confidential and trade secret information to develop ancillary services for its own benefit.  (8) BioFire has engaged in discussions with its customers about offering those types of services and its development team has explored similar services offerings.  (9) Upon information and belief, BioFire has provided, or is working to provide, its customers with ██████ and ancillary services similar to those USMN was offering and is also currently working to implement the technology behind USMN's ancillary service offerings ███████████ ███████████.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, with respect to the first sentence of Paragraph 53, BioFire admits that, consistent with USMN's contractual obligation to do so, USMN provided its form Laboratory Services Agreements to BioFire.  With respect to the fourth sentence, BioFire also admits that Mr. Caldwell provided a list of locations sent by Jarrod Pettit to BioFire employees and requested that employees seek clearance from him

before contacting any entity on the list.  BioFire denies the remaining allegations contained in Paragraph 53.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

## **FIRST CAUSE OF ACTION**

### **Violation of the Texas Uniform Trade Secrets Act (Against BioFire and Rachel Jones)**

54.     *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:**  BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

55.     *(1) USMN's pricing and order terms, marketing strategies, and the functionality and processes of its utilization management and stewardship services offering, including its connectivity feature, are its confidential and trade secret information.   (2) USMN spent considerable time and resources in developing its confidential and trade secret information.*

**ANSWER:**  To extent the allegations in this Paragraph relate to BioFire, BioFire denies the allegations in the first sentence of Paragraph 55.  BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the allegations in the second sentence and therefore denies them.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

56.     *(1) USMN takes reasonable efforts under the circumstances to maintain the secrecy of its pricing and order terms, including, but not limited to, requiring confidentiality clauses in its contracts with health care providers.  (2) The Laboratory Services Agreements USMN enters with Qualified Sites include a confidentiality clause.  (3) USMN also takes reasonable efforts under the circumstances to maintain the secrecy of its marketing strategies and the functionality and processes of its utilization management and stewardship services offerings.  (4) It does not publicly disclose that information and its health care provider customers do not have access to the processes and functionality of the utilization management and stewardship services offerings.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, BioFire denies the allegations in the first and third sentences of Paragraph 56.  With respect to the allegations in the second sentence, BioFire admits that at least some of the Laboratory Services Agreements USMN has entered into with healthcare providers included a confidentiality clause.  With respect to the allegations in the fourth sentence, BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of such allegation, and therefore denies the same.  BioFire denies any remaining allegations in Paragraph 56.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

57.     *(1) BioFire willfully and maliciously misappropriated USMN's trade secret pricing and order information.  (2) BioFire acquired knowledge of the pricing and order information through improper means by misrepresenting, on multiple occasions, verbally and in writing, that it would not undermine USMN's efforts to market and sell to Qualified Sites.*

*BioFire knew that its knowledge of the pricing and order terms was gained under circumstances giving rise to a duty to maintain its secrecy or limit its use.  (3) BioFire was receiving the information because USMN was its sales partner and the information was provided to facilitate USMN's sales.  (4) BioFire, aware of the duty to maintain secrecy of the information or limit its use, used the pricing and order information without USMN's express or implied consent for an improper purpose when it disclosed the information to its sales personnel and used it to undercut USMN's pricing and steal the XpressMed and Check Point contracts and business relationships. Upon information and belief, BioFire is engaging or intending to engage in similar conduct with respect to other Qualified Sites.  (5) BioFire has circulated a list of USMN's prospects to its sales team.*

**ANSWER:**  To the extent the allegations in this Paragraph relate to BioFire, as to the allegations in the fifth sentence of paragraph 57, BioFire admits that Mr. Caldwell provided a list of locations sent by Jarrod Pettit to BioFire employees and requested that employees seek clearance from him before contacting any entity on the list.  BioFire denies the remaining allegations in Paragraph 57.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

58.    *BioFire willfully and maliciously misappropriated USMN's trade secret marketing strategies and functionality and processes, including source code, of its utilization*

*management and stewardship services offerings.  BioFire acquired knowledge of the information through improper means by misrepresenting, on multiple occasions, that it would not develop competitive services offerings.  BioFire was receiving the information because USMN was its sales partner and the information was provided to facilitate USMN's sales.  BioFire knew that its knowledge of USMN's marketing strategies and the functionality and processes, including source code, of its utilization management and stewardship services offerings was gained under circumstances giving rise to a duty to maintain its secrecy or limit its use.  BioFire, aware of the duty to maintain secrecy of the information or limit its use, intends to replicate USMN's marketing strategies.  Upon information and belief, BioFire has used, or intends to use, the functionality and processes, and possibly the source code, of USMN's utilization management and stewardship offering in its* ██████████████ .

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

59.     *Additionally, BioFire and Rachel Jones misappropriated USMN's trade secrets that USMN disclosed in connection with discussions about how to resolve the XpressMed and Check Point issue and how to move forward with marketing strategies that were beneficial to both BioFire and USMN.  Unbeknownst to USMN, Ms. Jones had decided that she was going to cause BioFire to terminate the relationship with USMN.  Despite that decision, through her conduct and the conduct of those reporting to her, BioFire and Ms. Jones led USMN to believe that it needed to share information about its prospects and new Qualified Sites to further those discussion and have an ongoing relationship with BioFire.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

60.     *BioFire and Ms. Jones acquired knowledge of USMN's confidential and trade secret information through improper means by misrepresenting that the parties were negotiating the relationship moving forward and setting "Rules of Engagement." BioFire and Ms. Jones knew that USMN's trade secret information was being provided under circumstances giving rise to a duty to maintain its secrecy or to limit its use.  BioFire and Ms. Jones, aware of the duty to maintain confidentiality and limit use of the information, have used the information for their own benefit.  Among other things, BioFire's Curt Caldwell circulated a list of prospects to BioFire's sales team, and, upon information and belief, both he and Ms. Jones used USMN's information to solicit Hansa.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, BioFire admits that Mr. Caldwell provided a list of locations sent by Jarrod Pettit to BioFire employees and requested that employees seek clearance from him before contacting any entity on the list. BioFire denies the remaining allegations of Paragraph 60.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

61.     *BioFire's and Ms. Jones' misappropriation has damaged USMN.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not

obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

## SECOND CAUSE OF ACTION

### Tortious Interference with Economic Relations (Against BioFire)

62.    *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

63.    *USMN had valid contracts with XpressMed, Check Point, Hansa, and other Qualified Sites, as well as the reasonable probability of future prospective economic relations with those providers.*

**ANSWER:** To the extent the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

64.    *BioFire knew of USMN's contracts and relationships with XpressMed, Check Point, Hansa, and the other Qualified Sites because the LSP Agreement required USMN to send its Laboratory Services Agreements with those entities to BioFire.*

**ANSWER:** To the extent the allegations in this Paragraph relate to BioFire, BioFire admits that the Amended LSP Agreement required USMN to send its Laboratory Services Agreements with customers to BioFire.  BioFire denies any remaining allegations in Paragraph 64.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

65.     *BioFire willfully and intentionally interfered with USMN's contracts and potential economic relations with XpressMed and Check Point by encouraging those entities to cut out USMN and instead deal directly with BioFire.*

**ANSWER:** To the extent the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

66.     *BioFire's interference with USMN's contracts and potential economic relations with XpressMed and Check Point was through improper means and/or was independently tortious or unlawful because: (i) BioFire had a legal obligation under the LSP Agreement not to circumvent USMN's efforts by marketing or selling its products to Qualified Sites; and (ii) BioFire fraudulently and/or negligently misrepresented that it would maintain the confidentiality of USMN's confidential and trade secret information and would not use that information to compete with USMN.  XpressMed and Check Point were, at the time of interference, Qualified Sites.  Alternatively, BioFire's interference with USMN's contract with XpressMed and Check Point was through improper means and/or was independently unlawful because it breached the covenant of good faith and fair dealing in claiming that XpressMed and Check Point were not Qualified Sites after accepting the Purchase Order and shipping Instruments to XpressMed and Check Point.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and

Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

67.     *BioFire willfully and intentionally interfered with USMN's contract and potential economic relations with Hansa, and all other Qualified Sites, by wrongfully placing USMN's account on hold and refusing to fulfill USMN's Purchase Orders.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied. To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

68.     *BioFire's interference with USMN's contracts and potential economic relations with Hansa and all other Qualified Sites was through improper means as it did so (i) in reliance on a "default" it orchestrated through fraud and/or (ii) because it breached the LSP Agreement and/or the covenant of good faith and fair dealing in refusing to fill USMN's Purchase Orders.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied. To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

69.     *BioFire's interference proximately caused USMN injury.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied. To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and

Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

### THIRD CAUSE OF ACTION

#### Fraudulent Inducement (Against BioFire)

70.   *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

71.   *Before entering into the contracts with USMN, BioFire represented that it had not provided ancillary services like those USMN offered to its customers in the past, and that it would not provide the ancillary services USMN provides to health care providers.  BioFire's representations were about important and material facts.*

**ANSWER:**  Denied.

72.   *USMN reasonably and justifiably relied upon BioFire's false representations that it did not want to provide ancillary services and, as a result, it entered into agreements with BioFire.  Pursuant to those agreements, USMN shared confidential and trade secret information with BioFire and proceeded to provide good and valuable services.*

**ANSWER:**  Denied.

73.   *At the time BioFire made the representations, they were false or made recklessly and without regard for their truth.  Upon information and belief, and based upon subsequent actions, BioFire intended to use USMN's confidential and trade secret information for its own benefit, to compete with USMN, and develop its own ancillary services offerings.  Had USMN known BioFire intended to develop its own ancillary services to compete with USMN, including transferring USMN's confidential and trade secret information and work product to BioFire's internal sales team, and that BioFire intended to improperly terminate USMN's contract, it*

*would not have entered into the agreements with BioFire and it would not have, pursuant to those agreements, disclosed its trade secret information to BioFire.*

**ANSWER:** Denied.

74.   *BioFire's fraudulent misrepresentations have injured USMN.*

**ANSWER:** Denied.

### FOURTH CAUSE OF ACTION

### Fraud (Against BioFire)

75.   *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes

76.   *BioFire, through Messrs. Caldwell and Kathrein, represented that while the parties were engaged in discussions about how to handle BioFire's interference with USMN's Laboratory Services Agreement with XpressMed and Check Point, USMN did not need to make payments to BioFire, and that those unpaid amounts would be offset against any agreed-upon monetary resolution. BioFire's representations were about important and material facts.*

**ANSWER:** Denied.

77.   *At the time the statements were made, however, they were false, or they were made recklessly and without regard for their truth.  BioFire did not intend to allow USMN to offset those payments.  Instead, it was simply making those statements to induce USMN to forego making the scheduled payments, declare a default, and place USMN's account on hold—thus gaining leverage in attempting to resolve USMN's claims against it or providing it an excuse to terminate the contract with USMN.*

**ANSWER:** Denied.

78.   *USMN reasonably and justifiably relied upon BioFire's false representations that it could offset any scheduled payments and, accordingly, did not make certain payments.*

**ANSWER:** BioFire admits that USMN failed to pay past-due invoices.  BioFire denies the remaining allegations in Paragraph 78.

79.    *BioFire has since declared USMN in "default," refused to accept USMN's Purchase Orders or to ship products to Qualified Sites, and ultimately purported to terminate the contract with USMN.*

**ANSWER:** BioFire admits that USMN is in "default" and BioFire has not shipped any additional products for USMN since June 22, 2019.  BioFire also admits it has terminated its contract with USMN.  BioFire denies any remaining allegations in Paragraph 79.

80.    *Additionally, throughout the parties' relationship, BioFire's representatives, including Mr. Kathrein and Mr. Caldwell, repeatedly assured USMN that BioFire was not interested in competing with USMN and would not circumvent its efforts.   BioFire's representatives also represented to USMN that BioFire had no interest in providing the types of ancillary services USMN offered in connection with BioFire's Products.*

**ANSWER:**  Denied.

81.    *Those representations were important and material in that USMN was investing considerable time and resources into the relationship and was disclosing trade secret information to BioFire.*

**ANSWER:**  Denied.

82.    *(1) The representations were false when made, and BioFire's representatives knew the representations were false when made.  (2) BioFire had its own sales team targeting the same types of facilities as USMN.  (3) In fact, the BioFire sales team competed with USMN for the XpressMed and Check Point relationships.  (4) And BioFire has discussed providing ancillary services similar to those USMN offered with its customers.  (5) Upon information and*

*belief, and based upon subsequent actions, BioFire intended to use USMN's confidential and trade secret information for its own benefit, to compete with USMN, and develop its own ancillary services offerings.*

**ANSWER:** As to the allegations in the second and third sentences of Paragraph 82, BioFire admits that, before and after it entered into an agreement with USMC and/or USMN, it has had a sales team that marketed and sold its products to point of care and outpatient locations, and that USMN knew before the parties entered into an agreement and throughout the parties' agreement that BioFire's sales team sold BioFire's products to point of care and outpatient locations. BioFire further admits that it entered into an agreement with XpressMed and Check Point. BioFire denies the remaining allegations in Paragraph 82.

83.     *USMN reasonably and justifiably relied on BioFire's representations in sharing its trade secret information with BioFire.*

**ANSWER:** Denied.

84.     *BioFire's representations have injured USMN.*

**ANSWER:** Denied.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation (Against BioFire)

85.     *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

86.     *BioFire represented to USMN that while the parties were engaged in discussions about how to handle BioFire's interference with USMN's Laboratory Services Agreement with XpressMed and Check Point, USMN did not need to make payments to BioFire and it would be authorized to offset those unpaid amounts against any agreed-upon monetary resolution. BioFire's representations were about important and material facts.*

**ANSWER:** Denied.

87.    *At the time those statements were made, however, they were false.  BioFire did not intend to allow USMN to offset those payments.  The BioFire representatives who made those statements on BioFire's behalf failed to use reasonable care to determine whether the statements were true.*

**ANSWER:** Denied.

88.    *BioFire's representatives were in a better position than USMN to know whether BioFire was temporarily waiving payment obligations, if any, and if the amounts could be treated as an offset.*

**ANSWER:** Denied.

89.    *BioFire had a financial interest in the relationship with USMN, including in resolving the parties dispute and with respect to the LSP Agreement.*

**ANSWER:** BioFire admits that during the period that the First Amended LSP Agreement was in effect, USMN was obligated to pay BioFire as provided by the terms of the First Amended LSP Agreement.  BioFire denies the allegations in Paragraph 89.

90.    *USMN reasonably relied on BioFire's representations.*

**ANSWER:** Denied.

91.    *BioFire's representatives also represented to USMN that BioFire had no interest in providing the types of ancillary services USMN offered in connection with BioFire's products.*

**ANSWER:** Denied.

92.    *At the time BioFire made the representations, they were false.  Upon information and belief, and based upon subsequent actions, BioFire intended to use USMN's confidential*

and trade secret information for its own benefit, to compete with USMN, and develop its own ancillary services offerings.

**ANSWER:** Denied.

93.      *BioFire's representatives were in a better position than USMN to know how BioFire would use the information USMN provided it and to know whether BioFire intended to develop its own ancillary services offerings.*

**ANSWER:** BioFire admits that its representatives were likely in a "better position" to know how BioFire might use information provided to BioFire by USMN.  BioFire denies that it intended to use, or did use, any information that USMN provided for an improper purpose. BioFire denies any remaining allegations in Paragraph 93.

94.      *BioFire had a financial interest in the relationship with USMN and in developing its own products and services.*

**ANSWER:** BioFire admits that during the period that the Amended LSP Agreement was in effect, USMN was obligated to pay BioFire as provided by the terms of the First Amended LSP Agreement.  BioFire further admits that it has a financial interest in developing its own products and solutions.  BioFire denies any remaining allegations in Paragraph 94.

95.      *USMN reasonably and justifiably relied on BioFire's representations.*

**ANSWER:** Denied.

96.      *BioFire's negligent misrepresentation was the proximate cause of injury to USMN.*

**ANSWER:** Denied.

## SIXTH CAUSE OF ACTION

### Fraud (Against Rachel Jones)

97.      *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

98.     *After USMN and BioFire began discussing how to resolve BioFire's theft of USMN's contract with XpressMed and Check Point, Rachel Jones made the decision that BioFire was going to terminate the relationship with USMN.  Despite making that decision, Ms. Jones, through her conduct and representations regarding possible solutions and an amended agreement, caused USMN to believe there was an opportunity to salvage the business relationship and set clear parameters so that USMN and BioFire were not competing for and marketing to the same prospects.  Ms. Jones used her authority over Messrs. Caldwell, Reen, and Kathrein to have them continue the negotiations with USMN and to convey and represent to USMN that the parties were working toward an amicable resolution.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

99.     *Because of Ms. Jones' conduct, and the conduct of Messrs. Caldwell, Reen and Kathrein that she orchestrated, USMN was negotiating in good faith, commenting on "Rules of Engagement," and responding to requests for prospect lists.  USMN also continued to sell BioFire Products and its services and send those contracts to BioFire.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

100.     *The representations, through words and conduct, that BioFire was interested in a solution and that there was a path for the parties to continue their relationship was both material and false.  At the time Ms. Jones made the misrepresentations, through her words and conduct, and at the time she encouraged Messrs. Caldwell, Reen, and Kathrein to make similar representations, she knew the representations were false because she had already decided to terminate the contract with USMN.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

101.     *The representations were made with the intent to induce USMN to share its list of prospects and to continue sharing their agreements with Qualified Sites.  USMN reasonably and justifiably relied on the representation, and it shared its prospect lists and agreements with Qualified Sites, including Hansa, with BioFire.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

102.     *BioFire's decision to terminate USMN was not communicated to USMN until it had already provided its confidential and trade secret information, including its agreement with Hansa, to BioFire.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, if at all, BioFire responds that

it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

103.    *After terminating USMN, Ms. Jones, together with Mr. Caldwell, began soliciting Hansa for business*.

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

104.    *Ms. Jones's representations, and the representations of those acting as her agents, injured USMN because USMN turned over valuable trade secret information that Ms. Jones has used without providing USMN any compensation*.

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

## SEVENTH CAUSE OF ACTION

### Promissory Estoppel (Against BioFire)

105.    *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:**  BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

106.    *BioFire represented that while the parties were engaged in discussions about how to handle BioFire's interference with USMN's Laboratory Services Agreement with XpressMed and Check Point, USMN did not need to make payments to BioFire and promised that it would be authorized to offset those unpaid amounts against any agreed-upon monetary resolution.*

**ANSWER:**  Denied.

107.    *USMN acted with prudence, and reasonably and substantially relied on the promise BioFire made.*

**ANSWER:** Denied.

108.    *BioFire knew USMN relied on the promise and intended to induce USMN to rely on the promise, thus USMN's reliance was foreseeable.*

**ANSWER:** Denied.

109.    *At the time BioFire made the promise, it was aware of all material facts.*

**ANSWER:** Denied.

110.    *BioFire has since purported to terminate its agreement with USMN.*

**ANSWER:** BioFire admits that it has terminated its agreement with USMN.

111.    *USMN relied on BioFire's promise and, due to BioFire's subsequent actions, it has suffered losses.  Injustice can only be avoided by enforcing BioFire's promise.*

**ANSWER:** Denied.

<u>**EIGHTH CAUSE OF ACTION**</u>

**Quantum Meruit/Unjust Enrichment (Against BioFire)**

112.    *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

113.    *BioFire obtained a benefit from USMN when it received USMN's confidential and trade secret information, including lists of business relationships and leads, pricing and order terms, marketing strategies, and the functionality and processes of its utilization management and stewardship services offering, from USMN.*

**ANSWER:** Denied.

114.    *BioFire obtained this information from USMN by representing that it would not use the information in competition with USMN and by representing that BioFire was seeking*

*resolution between it and USMN. However, BioFire had decided to terminate its agreement with USMN and actually intended to provide the information it received from USMN to its own sales force.*

**ANSWER:** Denied.

115.    *USMN was not aware of the fact that BioFire intended to use the information for its own benefit and that BioFire did not intend on maintaining a business relationship with USMN. USMN provided the information to BioFire with the expectation that it would be used in connection with setting "Rules of Engagement" in connection with an ongoing business relationship from which it would receive a financial benefit. BioFire had reasonable notice that USMN expected compensation for the information.*

**ANSWER:** Denied.

116.    *USMN suffered and continues to suffer damage as a result of BioFire's possession and use of USMN's business information without any compensation to USMN.*

**ANSWER:** Denied.

## NINTH CAUSE OF ACTION

### Breach of Contract-LSP Agreement (Against BioFire)

117.    *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

118.    *USMN and BioFire entered into the LSP Agreement, and it is a valid and enforceable contract.*

**ANSWER:** BioFire admits that USMN and BioFire entered into the First Amended LSP Agreement.

119.    *USMN fully or substantially performed its obligations under the LSP Agreement, or tendered performance of those obligations.*

**ANSWER:** Denied.

120. *BioFire materially breached Section 3.6 of the LSP Agreement by marketing and selling its products to Qualified Sites, including XpressMed and Check Point. BioFire also breached Section 3.6 by failing to refer additional orders from XpressMed and Check Point to USMN.*

**ANSWER:** Denied.

121. *Additionally, BioFire materially breached the LSP Agreement by wrongfully placing USMN's account on hold, refusing to accept Purchase Orders and ship Products, and by purporting to terminate USMN because it had no basis under the contract for taking those actions under the circumstances.*

**ANSWER:** Denied.

122. *BioFire's breaches caused USMN damages.*

**ANSWER:** Denied.

## TENTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing (Against BioFire)

123. *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

124. *The LSP Agreement between USMN and BioFire was effective January 3, 2019 and covered an initial three-year term, subject to annual extensions after the term's expiration.*

**ANSWER:** BioFire admits that the First Amended LSP Agreement covered a period of three years, and if the agreement was not terminated prior to the end of that period, the term of the agreement would be extended for an additional period, subject to additional conditions in the agreement.

125.   *Pursuant to its terms, the LSP Agreement could be terminated under certain limited circumstances, including if USMN failed to pay any undisputed amount within sixty days of the invoice date more than twice in a single calendar year.  USMN did not fail to timely pay undisputed payments more than twice in 2019 as those payments were disputed given BioFire's interference with XpressMed and Check Point.  Additionally, BioFire instructed USMN to withhold payment pending a resolution for that interference.*

**ANSWER:** BioFire admits that the First Amended LSP Agreement provides several bases for termination including that "[p]ayment terms will be thirty (30) days from the invoice date… In the event LSP fails to pay any undisputed amount within sixty (60) days from the invoice date, BioFire may provide written notice of default to LSP and place LSP's account with BioFire on credit hold… In the event LSP fails to pay any undisputed amount without 60 days of the invoice date as required by Section 6 more than two (2) times in a single calendar year, BioFire may either (a) immediately terminate this Agreement upon notice to LSP, or (b) withhold shipping Products until the account of LSP is current." BioFire denies the remaining allegations in Paragraph 125.

126.   *In the LSP Agreement, "BioFire reserve[d] the right to reject any Purchase Order for any reason" and could withhold shipping Products until an overdue account, based on the nonpayment of an undisputed invoice, was made current.  Pursuant to the covenant of good faith and fair dealing, however, BioFire impliedly promised USMN that it would not intentionally or purposely do anything that would destroy or injure USMN's right to receive the fruits of the LSP Agreement.*

**ANSWER:** BioFire admits that the First Amended LSP Agreement provides, "BioFire reserves the right to reject any Purchase Order for any reason, including but not limited to LSP's payment

history…In the event LSP fails to pay any undisputed amount within sixty (60) days from the invoice date, BioFire may provide written notice of default to LSP and place LSP's account with BioFire on credit hold… In the event LSP fails to pay any undisputed amount without 60 days of the invoice date as required by Section 6 more than two (2) times in a single calendar year, BioFire may either (a) immediately terminate this Agreement upon notice to LSP, or (b) withhold shipping Products until the account of LSP is current." As to the second sentence of Paragraph 106, this sentence consists of a legal conclusion to which no response is required, but to the extent a response is deemed required, BioFire denies the remaining allegations in Paragraph 126

127. *BioFire refused to fulfill USMN's Purchase Order for Hansa and has entirely stopped doing business with USMN.*

**ANSWER:** BioFire admits it did not fill any Purchase Orders for USMN after June 22, 2019 when it placed USMN's account on hold and notified USMN of its termination of the First Amended LSP Agreement on July 16, 2019.  BioFire denies any remaining allegations in Paragraph 127.

128. *BioFire is intentionally and purposely destroying and injuring USMN's right to receive the benefits of the LSP Agreement by essentially terminating the LSP Agreement without any lawful basis for doing so.  It entirely stopped accepting and filling Purchase Orders and shipping product during the term of the LSP Agreement where there was no basis for it to withhold shipment of Products and/or terminate the agreement.*

**ANSWER:** Denied.

129. *BioFire's breach of the covenant of good faith and fair dealing has injured USMN.*

**ANSWER:** Denied.

## ELEVENTH CAUSE OF ACTION

**Breach of Contract-Laboratory Services Agreement, alternatively, Oral Agreement
(Against XpressMed, Check Point)**

130.    *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

131.    USMN and XpressMed and Check Point entered into a Laboratory Services Agreement, and it is a valid and enforceable contract.

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

132.    *USMN performed or tendered performance of its obligations under the LSP Agreement.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

133.    *XpressMed and Check Point materially breached the agreement and instead chose to enter into a contract directly with BioFire.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire

responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

134.    *XpressMed and Check Point's breach caused USMN damages.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

135.    *Alternatively, USMN and XpressMed and Check Point entered into an oral agreement concerning the purchase of BioFire Products and USMN's services.  USMN performed or tendered performance of its obligations.  XpressMed and Check Point materially breached the agreement and instead chose to enter into a contract directly with BioFire. XpressMed and Check Point's breach caused USMN damages.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, upon information and belief, denied.  To the extent that the allegations in this Paragraph relate to XpressMed and Check Point, BioFire responds that it is not obligated to respond to such allegations and leaves it to XpressMed and Check Point to determine whether they are obligated to respond to the allegations and, if so, what their response should be.

## CONDITIONS PRECEDENT

136.    All conditions precedent to USMN's claims for relief, if any, have occurred or have been performed.

**ANSWER:** Denied.

## ACTUAL, CONSEQUENTIAL, AND EXEMPLARY DAMAGES

137.    *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

138.    *Because of BioFire's wrongful acts described above, USMN has suffered actual and consequential damages, including lost profits, reasonable royalties, and/or compensation for BioFire's unjust enrichment, exceeding the minimum jurisdictional limits of this Court. USMN has suffered reputational harm and loss of goodwill and seeks to recover for those losses. USMN also seeks disgorgement for BioFire's misappropriation of trade secrets. USMN pleads both general and specific damages on all causes of action.*

**ANSWER:** Denied.

139.    *USMN pleads that the limitation of liability clause contained in the LSP Agreement with BioFire is ambiguous and is unenforceable due to unconscionability.*

**ANSWER:** Denied.

140.    *BioFire's misappropriation of USMN's trade secrets was willful and malicious; accordingly, USMN seeks an award of exemplary damages in an amount not to exceed twice any damages award for the misappropriation.*

**ANSWER:** Denied.

141.    *BioFire's tortious interference and fraud were the result of willful and malicious or intentionally fraudulent conduct or conduct that manifested a knowing and reckless indifference toward, and a disregard, of USMN's rights. USMN seeks an award of exemplary damages for BioFire's tortious interference and fraud.*

**ANSWER:** Denied.

142.    *Because of Rachel Jones's acts described above, USMN has suffered actual and consequential damages, including lost profits, reasonable royalties, and/or compensation for*

*BioFire's unjust enrichment, exceeding the minimum jurisdictional limits of this Court. USMN also seeks disgorgement for Ms. Jones's misappropriation of USMN's trade secrets.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied. To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

143. *Ms. Jones's fraud was the result of willful and malicious or intentionally fraudulent conduct or conduct that manifested a knowing and reckless indifference toward, and a disregard, of USMN's rights. USMN seeks an award of exemplary damages for Ms. Jones's fraud. Ms. Jones' misappropriation of USMN's trade secrets was willful and malicious; accordingly USMN seeks an award of exemplary damages in an amount not to exceed twice any damages award for the misappropriation.*

**ANSWER:** To the extent that the allegations in this Paragraph relate to BioFire, denied. To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

## ATTORNEYS' FEES AND COSTS

144. *USMN incorporates the foregoing paragraphs herein for all purposes.*

**ANSWER:** BioFire incorporates its answers to the foregoing paragraphs herein for all purposes.

145. *USMN seeks recovery of its attorneys' fees, costs, and expenses from BioFire pursuant to Section 30 of the LSP Agreement.*

**ANSWER:** BioFire denies that USMN is entitled to attorneys' fees, costs, and expenses pursuant to Section 30 of the First Amended LSP Agreement.

146. *USMN seeks recovery of its reasonable attorneys' fees from BioFire and Ms. Jones pursuant to Texas Civil Practice and Remedies Code § 134A.005.*

**ANSWER:**  To the extent that the allegations in this Paragraph relate to BioFire, BioFire denies that USMN is entitled to attorneys' fees, costs, and expenses pursuant to Texas Civil Practice and Remedies Code § 134A.005.  To the extent that the allegations in this Paragraph relate to Rachel Jones, BioFire responds that it is not obligated to respond to such allegations and leaves it to Rachel Jones to determine whether she is obligated to respond to the allegations and, if so, what her response should be.

147. *USMN seeks recovery of its reasonable and necessary attorneys' fees and costs from XpressMed and Check Point pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.*

**ANSWER:**  BioFire is without knowledge or information sufficient to form a belief about the truth or falsity of the allegations of Paragraph 147 and therefore denies them.

<u>**AFFIRMATIVE DEFENSES**</u>

**FIRST AFFIRMATIVE DEFENSE**

(Failure to State a Claim)

USMN has failed to state any claim on which relief can be granted.  In particular, USMN had no agreement with BioFire until January 3, 2019.  In addition, USMN has not pled with particularity any purported misrepresentation and has not identified with sufficient particularity the intellectual property for which it is seeking protection.

**SECOND AFFIRMATIVE DEFENSE**

(Limitation of Liability)

USMN's claims for "incidental, indirect, special or consequential damages arising out of or related to [the First Amended LSP Agreement], whether based on strict or absolute tort

liability, negligence, or other theory of liability" are barred based on the limitation of liability clause in the parties' First Amended LSP Agreement.

## THIRD AFFIRMATIVE DEFENSE

### (Waiver and Estoppel)

When USMN signed the First Amended LSP Agreement, USMN knew that the agreement contained terms that were inconsistent with some of the representations USMN now alleges BioFire had made to USMN previously, but USMN knowingly signed the First Amended LSP Agreement anyway. Moreover, USMN told BioFire that USMN consented to BioFire's agreements with XpressMed and Check Point. For these and additional reasons, USMN's claims, in whole or in part, are barred under the doctrines of waiver and/or estoppel.

## FOURTH AFFIRMATIVE DEFENSE

### (Set Off)

USMN owes BioFire money under the First Amended LSP Agreement between the parties. Thus, to the extent that BioFire is found to be liable under the terms of the First Amended LSP Agreement, BioFire is entitled to a set-off against any damages awarded to BioFire due to the amounts USMN owes BioFire under the First Amended LSP Agreement.

## FIFTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

On information and belief, the alleged value of USMN's software trade secrets is based, in whole or in part, on the value of BioFire's intellectual property and data. Thus, USMN's software trade secret claims are barred, in whole or in part, because USMN would be unjustly enriched if it recovered its requested relief from BioFire in this action or they should be offset to the extent of the value of BioFire's intellectual property and data.

## SIXTH AFFIRMATIVE DEFENSE

### (Repudiation)

USMN's contract claims are barred, in whole or in part, on the grounds that USMN's wrongful refusal to perform its duties or obligations under the First Amended LSP Agreement, including, *inter alia*, its refusal to pay BioFire the amounts USMN owes BioFire under the First Amended LSP Agreement, constitutes a repudiation of the agreement, thereby excusing BioFire's performance.

## SEVENTH AFFIRMATIVE DEFENSE

### (Anticipatory Breach)

On information and belief, USMN's contract claims are barred, in whole or in part, by USMN's anticipatory breach of the First Amended LSP Agreement by, *inter alia*, the failure of USMN to pay the amounts USMN owes BioFire under the First Amended LSP Agreement, the failure of USMN to provide required services to its customers, and the inability of USMN to achieve its Kit Commitment.

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure of Condition Precedent)

USMN's contract claims are barred, in whole or in part, by the failure of USMN to achieve the condition precedents under the First Amended LSP Agreement, including, *inter alia*, the failure of USMN to pay the amounts USMN owes BioFire under the First Amended LSP Agreement.

## NINTH AFFIRMATIVE DEFENSE

### (Statute of Frauds)

Any claims of an oral agreement by USMN are barred by the Statute of Frauds.

## TENTH AFFIRMATIVE DEFENSE

### (Failure of consideration)

USMN's contract claims are barred by failure of consideration.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

USMN's claims for damages are barred by its failure to mitigate damages.

## TWELFTH AFFIRMATIVE DEFENSE

### (Lack of Capacity)

USMN doesn't have any capacity to sue under the Laboratory Services Agreement between USMC and BioFire.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

On multiple occasions USMN, including its officers, directors, employees and/or affiliates, pursued BioFire's customers and customer targets, including BioFire's customer targets XpressMed and Check Point.  In addition, USMN improperly withheld material facts during its contractual relationship with BioFire, including, for example, its attempt to hack into BioFire's confidential software system, and the fact that it was misrepresenting to its potential customers that they could not buy products directly from BioFire.  Moreover, USMN fraudulently claimed to have a contract with XpressMed and Checkpoint when it did not, extorting BioFire into giving USMN concessions based on the threat of litigation made under false pretenses.  For these and additional reasons, each and every one of USMN's causes of action that seeks equitable relief is barred by the equitable doctrine of unclean hands.

## PRAYER FOR RELIEF

WHEREFORE, BioFire respectfully requests that this Court enter the following relief:

1.  That judgment be entered in favor of BioFire on all causes of action asserted by USMN;

2.  That USMN receive no relief;

3.  That BioFire be awarded its attorneys' fees, costs and expenses as permitted by § 30 of the Amended LSP Agreement between the parties and the law, including under TUTSA § 134A.005(1); and

4.  Such other and further relief as the Court may deem just and proper.


January 21, 2020                                    Respectfully submitted,


                                                   */s/ Robert W. Kantner*
                                                   Robert W. Kantner
                                                   Texas State Bar No. 11093900
                                                   JONES DAY
                                                   2727 North Harwood Street
                                                   Dallas, TX  75201.1515
                                                   Telephone:  +1.214.330.3939
                                                   Facsimile:  +1.213.969.5100
                                                   Email:  rwkantner@jonesday.com

                                                   Aaron D. Charfoos (*pro hac vice*)
                                                   Kirsten Moran (*pro hac vice*)
                                                   JONES DAY
                                                   77 West Wacker Dr.
                                                   Chicago, IL 60601
                                                   Telephone: +1.312.269.4242
                                                   Email: acharfoos@jonesday.com;
                                                   kmoran@jonesday.com

                                                   ATTORNEYS FOR DEFENDANT
                                                   BIOFIRE DIAGNOSTICS, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2020, a true and correct copy of the foregoing instrument was served via email on the following counsel of record:

Julie Pettit
THE PETTIT LAW FIRM
2101 Cedar Springs Road, Suite 1540
Dallas, Texas  75201
jpettit@pettitfirm.com

Michael K. Hurst
Sara Hollan Chelette
LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas  75201
mhurst@lynnllp.com
schelette@lynnllp.com

*Attorneys for Plaintiff US Medical Networks, LLC*

Greg Weselka
GLAST, PHILLIPS & MURRAY, PC
14801 Quorum Drive, Suite 500
Dallas, Texas  75254
gweselka@gpm-law.com

*Attorney for Defendants XpressMed*
*Urgent Care of Crowley, LLC and*
*Check Point Urgent Care, LLC*

/s/ Robert W. Kantner
Robert W. Kantner